IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TANNER WHITE, <br><br> Plaintiff, <br><br> vs. <br><br> FLATHEAD COUNTY, SAM COX, and JOHN DOES 1-10, <br><br> Defendants. | CV 22–141–M–DWM <br><br> OPINION <br> and ORDER |

Plaintiff Tanner White alleges that law enforcement used excessive force when they arrested him on August 25, 2019. (*See* Doc. 1.) On August 22, 2022, he filed suit under 42 U.S.C. § 1983 against Defendants Flathead County and Deputy[1] Sam Cox, alleging that: Cox used excessive force against him in violation of the Fourth Amendment (Count 1), Flathead County is liable under a *Monell*[2] theory (Count 2), Defendants violated his right to privacy under the Montana Constitution (Count 3), Defendants were negligent (Count 4), and Cox's conduct qualifies as assault and battery under Montana law (Count 5). (*See* Doc. 1.) Trial is set for July 24, 2023. (Doc. 10 at ¶ 1.)

---

[1] Cox is referred to as a Sergeant in subsequent filings. (*See, e.g.*, Doc. 24 at ¶ 14.)
[2] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

1

In the two pending motions, Defendants seek summary judgment on White's claim of municipal liability (Count 2),[3] (Doc. 17), and to exclude evidence and testimony of ongoing medical damages claimed to have resulted from the alleged constitutional violations, (Doc. 20). For the reasons stated below, the motion for summary judgment is granted and the motion in limine is denied.

## BACKGROUND

The following facts are undisputed, (*see* Docs. 19, 23, 24), and viewed in the light most favorable to White, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). Defendants provide few background facts regarding the underlying incident, merely stating that White alleges that "Cox kicked him in the head while he was handcuffed and lying on the ground." (Doc. 19 at ¶ 2.) While White does not dispute this fact, (*see* Doc. 23 at ¶ 2), he provides a more detailed narrative of the event in his own "Statement of Undisputed Facts," (*see* Doc. 24). In order to provide some context for the case, the following facts are taken from White's filing:

On August 25, 2019, Flathead County Sheriff's Deputies responded to a 911 report on White's location. (*Id.* ¶ 2.) When deputies arrived, White fled on foot before stopping and putting his hands up. (*Id.* ¶¶ 3–5.) White willingly went to

---

[3] Both parties incorrectly refer to the municipal liability claim as "Count 3." (*See* Doc. 18 at 2; Doc. 22 at 2; Doc. 23 at ¶ 3.)

2

the ground, but told officers that he could not breath when they restrained him by putting their knees on his back. (*Id.* ¶¶ 6–8.) White attempted to lift his head off the ground, which the deputies interpreted as resisting arrest. (*Id.* ¶¶ 9–10.) Deputies then told White numerous times to "shut up" and Deputy Pesola restrained his head. (*Id.* ¶¶ 11–12.) While White was on the ground in handcuffs and being restrained by the deputies, Cox kicked him in the head. (*Id.* ¶¶ 14–16.) According to White, "no officers present gave any indication that the kick was unusual or out of the ordinary." (*Id.* ¶ 17.)

## ANALYSIS

### I. Flathead County's Liability

#### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014).

#### B. *Monell* Liability

3

White claims that Flathead County is responsible for the violation of his constitutional rights under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). To prevail on a *Monell* claim against the County, White must establish that (1) Cox's actions "amounted to an unconstitutional application of excessive force" and (2) the County's "policy caused the constitutional wrong." *See Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). Defendants' motion focuses on the second element. The Ninth Circuit recognizes four situations when local government conduct may be considered a policy: "(1) an official policy; (2) a pervasive custom or practice; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). A local government "may not, however, be sued under a *respondeat superior* theory." *Id.* An "official policy must be the moving force of the constitutional violation in order to establish the liability of a government body under § 1983." *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (internal quotation marks omitted).

According to Defendants, "aside from the allegation that [White] was kicked, [White] does not allege any facts which would show a widespread pattern or practice of using or tolerating unlawful force." (Doc. 18 at 2.) In response, White concedes that he has not presented facts supporting a pattern or practice, but rather alleges that "Cox's conduct demonstrates a custom or practice of a failure of

4

Flathead County to adequately train its officers." (Doc. 22 at 4.) White further argues that the Flathead County Sheriff "'ratified' Cox's actions by failing to discipline Cox or even comment on Cox's kick to White's head." (*Id.* at 7.) Ultimately, because White fails to raise a genuine factual dispute as to the County's liability under either theory, summary judgment is granted in Defendants' favor as to Count 2 of the Complaint.

### 1. Failure to Train

"A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006). "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Id.* "In resolving the issue of a [county]'s liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability to the [county], for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989). Nevertheless, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different

5

training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need." *Id.*; *see Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ("Failure to train may amount to a policy of deliberate indifference[] if the need to train was obvious and the failure to do so made a violation of constitutional rights likely."). "Mere negligence in training or supervision, however, does not give rise to a *Monell* claim." *Dougherty*, 654 F.3d at 900.

Here, White argues that the fact of Cox's actions and the lack of response by the other officers is sufficient to raise a genuine dispute as to whether the County adequately trained its deputies. Although Defendants are critical of White's inability to show a pattern or practice of conduct, White is correct that a plaintiff may "prove a failure-to-train claim without showing a pattern of constitutional violations where a violation may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long*, 442 F.3d at 1186. But White presents no evidence as to what training or "tools" the County provides—or fails to provide—for its deputies. Consistently, White does not present any evidence that the County had "actual or constructive notice that a *particular* omission in [its] training program cause[d its]

6

employees to violate citizens' constitutional rights." *City of Canton*, 489 U.S. at 407 (emphasis added).

White unpersuasively attempts to create a genuine factual dispute based on the assessment of William Buzzell, his police practices expert, assessment. Buzzell "opines that Defendant Cox and the other officers present on the scene did not exercise proper restraint or follow professional conduct, and these failures caused the violation of White's Constitutional rights." (Doc. 22 at 8.) But other than to say that an officer of "a similar level of experience and training as Cox would not have acted in this manner," (*see* Doc. 24-2 at 4), Buzzell does not opine on the type of training Cox or the other deputies did or should have received. In the absence of any other evidence, Buzzell's focus on "professional standards" speaks to potential negligence, which is insufficient to establish municipal liability under § 1983. *Dougherty*, 654 F.3d at 900.

Because White fails to present evidence showing that the need for more or different training is "so obvious" as to give rise to municipal liability, this theory does not support his claim. *Canton*, 489 U.S. at 390.

2. **Ratification**

A county may also be held liable for a constitutional violation if an authorized policymaker approves a subordinate's decision and the basis for it, which is known as ratification. *Lytle v. Carle*, 382 F.3d 978, 987 (9th Cir. 2004).

7

But "[a] mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Id.* The policymaker must have knowledge of the constitutional violation and make a "conscious, affirmative choice" to ratify the conduct. *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003), *overruled on other grounds by Brosseau v. Haugen*, 543 U.S. 194 (2004). The "mere failure to discipline" in an individual instance does not amount to ratification. *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd on other grounds*, 575 U.S. 600 (2015); *see Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) ("To hold [counties] liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law.").

Here, White argues that "the sheriff ratified Cox's actions by failing to discipline Cox or even comment on Cox's kick to White's head." (Doc. 22 at 7.) Other than this assertion, White presents no facts that the sheriff made a deliberate choice to endorse Cox's conduct or the basis for it. "This bare allegation is insufficient to create a triable issue of fact." *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1253 (9th Cir. 2010). Accordingly, White also fails to raise a genuine factual dispute regarding *Monell* liability under a ratification theory.

    **3.**    **Montana Code Annotated § 2–9–102**

8

Finally, stepping outside § 1983 and *Monell*, White insists that the County cannot be dismissed from this action because under Montana law, "[e]very governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties whether arising out of a governmental or proprietary function . . . ." Mont. Code Ann. § 2–9–102. But Montana law cannot expand the boundaries of direct federal municipal liability under § 1983, especially when the concept of *respondeat superior* was explicitly rejected in *Monell*. *See City of Canton*, 489 U.S. at 392. Moreover, granting summary judgment in favor of the County as to Count 2 does not alter the County's indemnification obligations to Cox or its potential liability under the remaining state law causes of action.

## C.  Conclusion

Based on the foregoing, Flathead County is entitled to summary judgment as a matter of law as to Count 2 of the Complaint.

## II.  Ongoing Damages

Defendants have also filed a motion in limine that seeks to exclude evidence of damages for White's ongoing injuries from trial, specifically "evidence or testimony that [White] suffers from blurred vision, headaches, ringing in his ears, and post-traumatic stress disorder as a result of the alleged kick to his head." (Doc. 20 at 1.) The crux of Defendants' argument is that in order to establish that

9

Defendants caused his injuries, White needs expert testimony as to medical causation and that such testimony necessarily exceeds the scope of the testimony offered by his treating physicians. In response, White concedes that he is relying on his treating physicians to prove causation, but insists that they are permitted to testify regarding "care, treatment, and prognosis" and that "'prognosis' includes the likely course of an ailment." (Doc. 26 at 4.) Although subject to appropriate trial objection, White has the better argument at this stage.

State law provides the substantive standard governing proof of causation in personal injury cases. *See, e.g., Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). Under Montana law, causation is an essential element of a negligence claim. *Kostelecky v. Peas in a Pod LLC*, 518 P.3d 840, 852 (Mont. 2022). Such a claim therefore "requires affirmative proof that the alleged negligent conduct . . . was the cause-in-fact (i.e., factual cause) of the alleged harm and resulting damages." *Id.* "Except in rare cases where the cause of the alleged injury is plain and obvious to lay persons without need for specialized knowledge or expertise, proof of the occurrence, nature, cause, and/or prognosis of an alleged bodily or mental injury, disease process, or other medical condition generally requires qualified medical expert testimony." *Id.* at 852–53; *see Hendricksen v. State*, 84 P.3d 38, 53 (Mont. 2004) (excluding alternate causation evidence when the state failed to present expert testimony to establish causal connection between

subject injury and preexisting injury or independent cause). Thus, as recognized by the parties, expert testimony is necessary to establish medical causation here.

Rule 26(a)(2) of the Federal Rules of Civil Procedure provides for disclosures by two types of experts: those retained or specifically employed to give expert testimony in a case, Fed. R. Civ. P. 26(a)(2)(B), and those who are not retained or specially employed, but who nonetheless may provide expert testimony, *id.* 26(a)(2)(C). An expert who falls into the first category is required to provide an expert report. *Id.* 26(a)(2)(B). However, an expert who falls into the second category need only provide disclosures stating both "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705[ ] and . . . a summary of the facts and opinions to which the witness is expected to testify." *Id.* 26(a)(2)(C)(i), (ii).

Here, White disclosed Dr. Tyler Ofstad at Glacier Eye Clinic PC and Laura Hall, NP at Heavens Peak Healthcare as treating physicians under Rule 26(a)(2)(C). (*See* Doc. 21-1 at 3, 15–18 (Ofstad records), 19–32 (Hall records).) Thus, Dr. Ofstad and Nurse Hall are permitted to testify to those opinions "formed during the course of [White's] treatment," *Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011), including opinions as to medical causation so long as they "reached [their] conclusion[s] about the cause of [White]'s injuries at the time of the treatment," *Fielden v. CSX Transp., Inc.*, 482

11

F.3d 866, 871 (6th Cir. 2007). Thus, contrary to Defendants' suggestion, treating physicians are not categorically precluded from testifying about medical causation.

Less clear, however, is exactly what Dr. Ofstad and Nurse Hall intend to testify about. In his Rule 26(a)(2)(C) summary, White merely states that Dr. Ofstad and Nurse Hall provided care and that they are "expected to testify about Mr. White's condition and outlook." (Doc. 21-1 at 3.) The attached medical records provide no further clarity. As it relates to Dr. Ofstad, his September 15, 2021 intake form indicates that White's "chief complaint" was "twitching/pain – trauma x 2 years ago," and that he discussed "dry eye" issues with the doctor and was directed to call back with any other concerns. (*Id.* at 16.) As it relates to Nurse Hall, White visited her on April 27, 2021 and November 3, 2021. The April 27 visit makes no reference to prior trauma or outstanding health issues of any kind. (*See id.* at 19.) During his November 3 visit, White reported prior head trauma based on the current incident and complained of seizures and ongoing headaches. (*Id.* at 23.) He was referred to neurology. (*Id.* at 25.) Other than a patient questionnaire filled out by White himself, (*see id.* at 31–32), that is the extent of causation-related references in the medical records included in White's expert disclosures. It is therefore difficult to say what, if any, medical causation opinions were formed by Dr. Ofstad or Nurse Hall during their treatment of White. This is problematic for both parties.

White's opaque expert disclosures are problematic for him because the testimony of his experts is limited by what was actually disclosed under Rule 26(a)(2)(C). White identifies neither the specific expert opinions nor the specific portions of the medical records the experts relied on in forming those opinions. Thus, it will be difficult for White to show at trial that any of the putative expert testimony was properly disclosed. Moreover, medical causation testimony under Montana law "is competent and admissible evidence only if given on a more probable that not basis, i.e., a more likely than not basis, or other similar or greater level of certainty of opinion." *Kostelecky*, 518 P.3d at 853. Consistently, an expert opinion that a specific event "could, may, or might have possibly caused or contributed to . . . [a] medical condition . . . is neither competent nor relevant proof of causation in that matter." *Id.* Accordingly, Dr. Ofstad and Nurse Hall must have specific and certain opinions regarding causation that have been disclosed under Rule 26(a)(2)(C).

But the opacity of the disclosures is also problematic for Defendants because they were required to raise any challenges to the sufficiency of the disclosure under Rule 26(a)(2) within fourteen days of the disclosure being made. (*See* Doc. 10 at ¶ 12(c).) That time has passed. Thus, while White arguably failed to include "a summary of the facts and opinions to which the witness is expected to testify" as required by Rule 26(a)(2)(C)(ii), that is not the argument Defendants can or do

13

make here. Rather, as discussed above, Defendants focus on whether White's treatment providers can testify regarding medical causation. Because they can so long as their opinions were formed during the course of treatment, Defendants' motion is denied.

However, White is cautioned that any testimony from Dr. Ofstad or Nurse Hall regarding opinions formed outside of the course of treatment, in anticipation of litigation, or based on their subsequent review of the filings in this case will be excluded. *See Fielden*, 482 F.3d at 871; *Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 734–35 (7th Cir. 2010). Nor is he permitted to use Dr. Ofstad or Nurse Hall as a mouthpiece for self-reports regarding causation.

## CONCLUSION

Accordingly, IT IS ORDERED that Defendants' motion for summary judgment (Doc. 17) is GRANTED. Count 2 of the Complaint is DISMISSED.

IT IS FURTHER ORDERED that Defendants' motion in limine (Doc. 20) is DENIED subject to appropriate trial objection based on the limited scope of White's disclosure.

DATED this 5th day of July, 2023.

Donald W. Molloy, District Judge
United States District Court

14